IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

DR. STURLA STEFANSSON,      :
          :
     **Plaintiff,**      :
          :      **5:04CV40 (DF)**
**vs.**      :
          :
**THE EQUITABLE LIFE ASSURANCE :**
**SOCIETY OF THE UNITED STATES :**
**and DISABILITY MANAGEMENT :**
**SERVICES, INC.,**      :
          :
     **Defendants.**      :

## O R D E R

This case involves a coverage dispute between a doctor and his insurance

provider.  At the center of the dispute is whether Plaintiff Dr. Sturla Stefansson is

"totally disabled" from his job such that he is eligible to recover disability benefits

under six insurance policies issued to him by Defendant Equitable Life Assurance

Society of the United States ("Equitable") and administered by Defendant Disability

Management Services, Inc. ("DMS") (collectively "Defendants").  Before that

question can be answered, however, the Court must address three preliminary

motions that are currently pending:  (1) Defendants' Motion to Compel a Second

Independent Medical Exam (tab 46); (2) Defendants' Motion for Partial Summary

Judgment (tab 59); and (3) Defendants' Motion to Remand Non-Justiciable Claims for Administrative Review and to Establish a Standard of Review (tab 80).

This Order addresses each motion.

## I.    BACKGROUND

Until 2003, Dr. Sturla Stefansson, M.D., worked as an anesthesiologist in Macon, Georgia, where he had practiced medicine in that capacity for over twenty years.  After undergoing open-heart surgery in the fall of 2002, Dr. Stefansson was out of work for nearly seven months.  He returned to work in May 2003, but soon found himself unable to perform the day-to-day tasks his job demanded. Ultimately, he gave up his medical practice altogether.  Seeking disability benefits under six insurance policies issued to him by Equitable,[1] Dr. Stefansson submitted his claim to DMS, the third-party administrator authorized by Equitable to process claims and make eligibility determinations under the policies.

In forwarding his claim to DMS, Dr. Stefansson alleged that he had become totally disabled from work due to complications resulting from his surgery.  When DMS failed to render a decision on his claim after nearly four months, he sued

---

[1] Policy No. 83 707 839 (June 1, 1983); Policy No. 83 710 895 (August 1, 1983); Policy No. 84 707 682 (July 1, 1984); Policy No. 84 711 174 (September 1, 1984); Policy No. 88 712 664 (June 1, 1988); Policy No. 89 712 722 (June 1, 1989).

2

Equitable in the State Court of Bibb County, Georgia, to recover benefits under the polices; penalties for Equitable's bad-faith refusal to pay; and attorney's fees under O.C.G.A. § 33-4-6 (Lexis 2000).  Dr. Stefansson also sued DMS, seeking damages for alleged intentional interference with contractual relations.  Compl. ¶¶ 16 & 18, tab 6, Ex. 7.

Defendants removed the case to federal court on the basis of diversity jurisdiction and answered the complaint in part by asserting that Dr. Stefansson's state-law claims were preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C.A. § 1144(a) (West 1999).  Though Dr. Stefansson has at all times throughout the course of this litigation maintained that his claims are not preempted, he nevertheless amended his complaint to assert alternative claims under ERISA in the event that the Court should decide the preemption issue in Defendants' favor.  In his amended complaint, Dr. Stefansson brings claims under 29 U.S.C.A. § 1132 for recovery of benefits and for attorney's fees and expenses. The facts recounted here are those relevant to the motions now pending, not to the merits of the underlying allegations.

In 1983, Dr. Stefansson and a number of other anesthesiologists formed Hemlock Anesthesia Associates, P.C. ("Hemlock")[2] (Mandel Dep., tab 65, at 5:1-3). The founding anesthesiologists co-owned Hemlock as equal shareholders and were also employees of the corporation.   (Mandel Dep., tab 65, at 5:6-22).   From Hemlock's incorporation in 1983 until 1988, Dr. Samuel Mandel, M.D. served as its Chief Operating Officer.  Dr. Mandel's responsibilities in that capacity included overseeing Hemlock's insurance programs and purchasing insurance for its employees. (Mandel Dep., tab 65, at 6:10-22).  After researching various programs offered by "all the companies that were available," Dr. Mandel determined Equitable to be the best alternative.  (Mandel Dep., tab 64, at 15:11-19).

Hemlock purchased Equitable disability insurance policies for every new doctor who came on board as an employee.  (Mandel Dep., tab 65, at 9:3-7).  All doctors employed by Hemlock were required to have disability insurance coverage provided by Equitable. (Mandel Dep., tab 65, at 15:4-10).  At the time the insurance was purchased, premiums for each policy were billed to and paid by Hemlock, not the insured doctors.   (Mandel Dep., tab 65, at 10:16-22).   Sometime later,

---

[2] Hemlock was subsequently renamed Central Georgia Anesthesia Services, but for clarity's sake will be referred to as "Hemlock" throughout this Order.

responsibility for paying the premiums shifted to each doctor individually.[3]  In structuring the insurance arrangement, Hemlock, through Dr. Mandel, chose to make the policies "company owned" to ensure that the doctors received the "maximum benefits."  (Mandel Dep., tab 65, at 18:11-12).  Hemlock never handled the administration of the policies and never played a role in setting or negotiating their terms.

The circumstances giving rise to this lawsuit began in October 2002 when Dr. Stefansson was serving as the Medical Director of Operating Rooms for the Medical Center of Central Georgia ("MCCG").  After not feeling well for a period of time and noticing some irregularities in his heart rate, Dr. Stefansson met with a heart surgeon, Dr. Fady S. Wanna, who ran some tests on him.  The results of Dr. Wanna's tests confirmed the need for open-heart surgery to replace a defective aortic valve. (Wanna Dep., tab 52, at 19:14-21).  Dr. Stefansson's valve was replaced with a prosthetic, and a two-level coronary bypass was performed.

---

[3] There is some uncertainty regarding whether the doctors began paying premiums individually in the mid-1980s or whether Hemlock continued to pay the premiums on their behalf until as late as 1997.  Either way, the parties do not dispute that Hemlock, for some period of time, paid for the Equitable policies.

Two weeks after surgery he was readmitted to the hospital to be treated for atrial fibrillation and pleural effusion. (Wanna Dep., tab 52, at 24:17-25 & 25:11-24). In the following months, Dr. Stefansson continued to recuperate until he felt able to return to work in May 2003.[4]  His return was short-lived, however, as he began to notice that he could not carry out even the simplest tasks required of an anesthesiologist.  His colleagues witnessed a marked decline in Dr. Stefansson's post-surgical job performance.  By June 2003, after consulting with several doctors at MCCG and concluding that he could no longer function as an anesthesiologist, Dr. Stefansson found it necessary to apply for disability benefits under the six Equitable policies.

Dr. Stefansson spoke on several occasions with DMS claims representatives about filing his claim for total disability.  He filled out the requisite claim forms and sent them to DMS for processing.  Those forms were received by DMS on July 11, 2003.  A DMS claims representative updated Dr. Stefansson by letters of August 22 and September 25 about the status of his claim and informed him that DMS still needed to receive several supporting documents to properly assess his eligibility for

_____

[4] Letters sent to Dr. Stefansson from DMS Claim Consultant Scott Rucki indicate that Dr. Stefansson received total disability benefits under the policies at issue from October 19, 2002 through April 30, 2003.  (Rucki Letters, tab 80, Ex. 10).

benefits.  On October 21, after receiving this information, DMS engaged a doctor to review the information contained in Dr. Stefansson's file.  Dr. Stefansson filed this suit on November 12, 2003.

## II.     DISCUSSION

### A.     Motion for Second Independent Medical Examination

Dr. Stefansson has already undergone two psychological examinations.  First, shortly after filing suit, he arranged to have a neuropsychological evaluation performed by Dr. Timothy Fjordbak, a clinical psychologist.  After observing Dr. Stefansson and putting him through a battery of tests, Dr. Fjordbak concluded that "today's results were not compatible with the abilities and aptitudes required for the competent practice of medicine. . . . [T]here were profound breakdowns in attention, concentration, integrated processing flexibility, sensitivity to visual detail, visuopractic efficiency, sequencing, and conceptual reasoning."  (Fjordbak Neuropsychological Summary, tab 54, Ex. 4, at 6).   Dr. Fjordbak also noted that "[t]hese results would not be commensurate with the problem-solving and leadership skills expected of a professional primarily responsible for providing and directing the care of patients." (Fjordbak Neuropsychological Summary, tab 54, Ex. 4, at 6).  Dr. Fjordbak's summary report was forwarded to Defendants for review.

7

Defendants were not satisfied with the conclusions reached by Dr. Fjordbak and requested that the Court order a second evaluation—this time an independent medical examination ("IME")—to be conducted by a court-appointed neuropsychologist.  The Court granted Defendants' request and selected Stephen N. Macciocchi, Ph.D., ABPN.  Dr. Stefansson underwent the IME on August 26, 2004.  Among other things, Dr. Macciocchi commented that, while Dr. Stefansson's problem-solving capabilities had shown some improvement since the initial evaluation, they still were "not optimal for a physician charged with complicated, daily medical decision making responsibilities."  (Macciocchi Neuropsychological Assessment, tab 80, Ex. 19).  He further noted that "a number of scientific studies [ ] have identified cognitive morbidity associated with AVR [aortic valve replacement] and CABG [coronary artery bypass grafting] surgery."  (Macciocchi Neuropsychological Assessment, tab 80, Ex. 19).  Finally, Dr. Macciocchi pointed out that the ability of Dr. Stefansson to function as an anesthesiologist in the operating room "may best be determined by a medical professional skilled in anesthesiology." (Macciocchi Neuropsychological Assessment, tab 80, Ex. 19).

Defendants reviewed Dr. Macciocchi's evaluation and, in light of what they perceive to be Dr. Stefansson's lack of candor in not disclosing certain information

to Drs. Fjordbak and Macciocchi, now contend that the conclusions reached in both prior evaluations are unreliable.[5]  Defendants learned through discovery that Dr. Stefansson did not inform Drs. Fjordbak and Macciocchi about certain pain and headache medications he had been prescribed prior to the evaluations.  Defendants also allege that Dr. Stefansson did not disclose prescriptions for medications sometimes used to treat symptoms of alcoholism.  Finally, Defendants suggest that various stressors related to an internal investigation of Dr. Stefansson's practice group at MCCG may have had a negative effect on his ability to concentrate on work-related tasks.  The practice-group investigation was not reported.

Defendants argue that these omissions may have skewed the results of Dr. Stefansson's two previous examinations.  To put to rest any uncertainties regarding the validity of the two prior tests, Defendants have moved the Court to order a second IME, this time proposing that Dr. Stefansson submit to blood and urinalysis tests to ensure the soundness of the new examination.

---

[5] "[D]efendants have learned of additional facts that cast doubt on the validity of both neuropsychological examinations.  Specifically, there is evidence of alcohol use, drug use, and extremely stressful conditions in the workplace, none of which was disclosed to, or assessed by, Dr. Fjordbak or Dr. Macciocchi during their examinations."  Defs.' Reply Brief in Supp. of Mot. for Second IME, tab 84, at 4-5.

To determine whether Dr. Stefansson should undergo a third psychological examination, the Court turns first to the text of Federal Rule of Civil Procedure 35. The Rule states that "[w]hen the mental or physical condition . . . of a party . . . is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner. . . . The order may be made only on motion for good cause shown."  Fed. R. Civ. P. 35(a) (West 2005).  It is undisputed that Dr. Stefansson's claim for disability benefits has placed his health in controversy.  As the Rule indicates, however, that alone is not enough.  Defendants must also show that there is "good cause" for subjecting him to yet another psychological examination.  Even where good cause is shown to exist, the question whether to order an evaluation is left to the trial court's discretion.  *See Curtis v. Express, Inc.*, 868 F. Supp. 467, 468 (N.D.N.Y. 1994); *see also Stinchcomb v. United States*, 132 F.R.D. 29, 30 (E.D. Pa. 1990); *Hardy v. Riser*, 309 F. Supp. 1234, 1241 (N.D. Miss. 1970).

Rule 35(a) imposes no limit on the number of examinations to which a party may be subjected.  But the moving party must satisfy the Rule's good-cause standard each time an examination is sought.  On the facts and circumstances presented here, the Court finds that Defendants' attempts to cast doubt upon the

legitimacy of the prior psychological findings are too conjectural and speculative to warrant a second IME.

With respect to the issue of undisclosed pain medications, the evidence shows that Dr. Stefansson filled prescriptions for and completed taking these medications[6] long before either of the psychological evaluations were conducted.  With one exception,[7] these medications were taken seven to eighteen months prior to any psychological testing of Dr. Stefansson.  This fact fatally undermines the main thrust of Defendants' argument for a second IME:  namely, that the initial tests are of questionable validity because Dr. Stefansson may have been under the influence of these medications at the time he was evaluated by Drs. Fjordbak and Macciocchi.

For purposes of testing a person's cognitive functioning, Dr. Macciocchi noted unsurprisingly that he would want to know whether, and to what extent, the person being tested was on any of these medications while under examination.  However, Defendants have produced no evidence showing that Dr. Stefansson was actually

---

[6] Dr. Stefansson filled prescriptions for Dilaudid, Hydrocodone/APAP, Ambien, Alprazolam (Xanax), and Temazepam (Restoril).  *See* Pl.'s Brief in Resp. to Defs.' Mot. for Second IME, tab 71, at 13.

[7] Dr. Stefansson filled a prescription for Dilaudid on October 20, 2003, and finished taking it seven days later, one month before Dr. Fjordbak's examination at the end of November.

taking these medications at the time of either examination. Without such evidence, the fact that Dr. Stefansson did not list these medications as ones he was currently taking does not raise any suspicions about the validity of the examinations and, thus, does not support a finding of good cause for further evaluation.

Likewise, there is no evidence before the Court to substantiate the claim that Dr. Stefansson's problems at work or any irregularities in the evaluations may be attributed to alcoholism. In fact, the deposition testimony of those who have known him both professionally and socially suggests that he may be, at most, a moderate social drinker. (Myer Dep., tab 51, at 10:3-7; Othman Dep., tab 92, at 36:16-24; Tarabadkar Dep., tab 53, at 29:4-9; Twibell Dep., tab 57, at 49:1-8). The evidence does not support Defendants' allegations of alcohol abuse.

Finally, the Court is not persuaded that Dr. Stefansson's failure to inform Drs. Fjordbak and Macciocchi of the investigation into his practice group justifies subjecting Dr. Stefansson to another round of psychological testing.

Because Defendants are unable to show good cause for further evaluation, their motion for a second IME is **DENIED.**

### B.      Motion for Partial Summary Judgment

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986). A genuine issue of material fact necessary to defeat a properly supported motion for summary judgment arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." **Anderson v. Liberty Lobby, Inc.**, 477 U.S. 242, 248 (1986). The Court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but may not make credibility determinations or weigh the evidence. *See* **Anderson**, 477 U.S. at 249. Finally, "the evidence presented cannot consist of conclusory allegations or legal conclusions." **Avirgan v. Hull**, 932 F.2d 1572, 1577 (11th Cir. 1991).

In moving for summary judgment, Defendants ask the Court to dismiss Dr. Stefansson's state-law claims as a matter of law. Defendants argue that those claims are preempted by ERISA, which states that "the provisions of this subchapter . . . shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan. . . ." 29 U.S.C.A. § 1144(a) (West 1999). Defendants contend that the policies under which Dr. Stefansson claims benefits are part of an

"employee benefit plan"[8] and that his state-law claims "relate to" that plan as contemplated by the statute.  Defendants further argue that, even if the state-law claims are not preempted, Dr. Stefansson's tortious-interference claim against DMS fails as a matter of law since DMS is not a stranger to the insurance contracts at issue.  Dr. Stefansson disagrees on both scores, maintaining that this suit does not implicate ERISA and that DMS is in fact a stranger to the contracts for purposes of the tortious-interference claim.

To address Defendants' preemption argument, the Court begins with the pertinent statutory language.  ERISA defines an "employee welfare benefit plan" as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, [or] disability. . . .

29 U.S.C.A. § 1002(1).  Using the statute as a guide, the Eleventh Circuit has identified five requirements that must be established before a welfare benefit plan will fall within the scope of ERISA: "[A] welfare plan requires (1) a 'plan, fund, or

---

[8] "The term 'employee benefit plan' or 'plan' means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan."  29 U.S.C.A. § 1002(3) (West 1999).

program' (2) established or maintained (3) by an employer or by an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability . . . benefits . . . (5) to participants or their beneficiaries." *Slamen v. Paul Revere Life Ins. Co.*, 166 F.3d 1102, 1104 (11th Cir. 1999) (quoting *Donovan v. Dilllingham*, 688 F.2d 1367, 1371 (11th Cir. 1982) (en banc)). "Whether an ERISA plan exists is a fact question for the Court to determine." *Stern v. Provident Life and Accident Ins. Co.*, 295 F. Supp. 2d 1321, 1324 (M.D. Fla. 2003); *see also Gahn v. Allstate Life Ins. Co.*, 926 F.2d 1449, 1451 (5th Cir. 1991). The parties do not dispute that the third, fourth, and fifth requirements have been met in this case. They do, however, disagree about the first two. Though not treated as analytically distinct in the parties' briefs, Eleventh Circuit precedent suggests that each requirement should be evaluated separately.[9] *See, e.g., Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1214 (11th Cir. 1999).

---

[9] It should be noted that, in determining whether a particular plan is governed by ERISA, "courts usually begin by examining whether the plan falls into the regulatory safe harbor, which excludes from ERISA's jurisdictional ambit certain group or group-type insurance programs offered by an insurer to employees or members of an employee organization." *Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1263 n.2 (11th Cir. 2004) (citing *Butero*, 174 F.3d at 1213-14 and 29 C.F.R. § 2510.3-1(j)). Dr. Stefansson has not sought refuge in the regulatory safe harbor, however. *See* Pl.'s Brief in Opp'n to Defs.' Mot. for Summ. J., tab 82, at 10 (stating that the regulatory safe harbor "has no bearing here."). Therefore, the Court makes no finding with respect to its applicability and instead focuses on the conventional analysis regarding whether a "plan, fund, or program" existed and, if so, whether it was "established" or "maintained" by Hemlock. *Id.*

### 1.    Plan, Fund, or Program

"[A] 'plan, fund, or program' under ERISA implies the existence of intended benefits, intended beneficiaries, a source of financing, and a procedure to apply for and collect benefits." *Donovan*, 688 F.2d at 1372.  In determining if a plan, fund, or program exists, "a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." *Id.* at 1373. Information about a plan's essential components may derive from various sources because "no single act in itself necessarily constitutes the establishment of the plan, fund, or program." *Id.*   Thus, the Court must examine the totality of the circumstances.

The Court has little difficulty concluding that a plan, fund, or program exists under the test set forth in *Donovan*.  After looking at the pertinent circumstances, a reasonable person could certainly ascertain the intended beneficiaries (the covered Hemlock clinic doctors), the intended benefits (disability income paid to a totally disabled doctor), the source of financing (initially Hemlock, through its premium payments), and the procedure used to apply for and collect benefits (as outlined in the insurance policies).  *See Butero*, 174 F.3d at 1214.  Thus, there is a "plan, fund, or

16

program" as that phrase has been defined by the caselaw in this Circuit.  But this conclusion does not automatically subject the plan to regulation under ERISA.  It must also have been "established" or "maintained" by Hemlock.

### 2.  Established or Maintained

"ERISA does not apply unless the employer itself established *or* maintained the plan." *Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1263 (11th Cir. 2004). The Court's inquiry on this issue is limited to "the employer . . . and [its] involvement with the administration of the plan . . . not the conduct of any other ERISA entity." *Id.* (internal quotations and citations omitted).  To determine if the plan is part of an employment relationship—the crux of the "established or maintained" requirement—courts "'look[ ] at the degree of participation by the employer in the establishment or maintenance of the plan.'" *Id.* (quoting *Gaylor v. John Hancock Mut. Life Ins. Co.*, 112 F.3d 460, 464 (10th Cir. 1997)).  Whether an employer intends for a benefit plan to be governed by ERISA is irrelevant.  The decisive inquiry is whether an employer "intended to establish or maintain a plan to provide benefits to its employees as part of the employment relationship." *Id.* at 1264.  If so, and if all other statutory criteria are met, then ERISA governs, irrespective of the parties' wishes. *Id.* (citing *Peckham v. Gem State Mut. of Utah*, 964 F.2d 1043, 1049 n.11 (10th Cir. 1992)).

17

An employer's decision to establish a benefit plan may be evidenced by certain acts or events, including "financing or arranging to finance or fund the intended benefits, establishing a procedure for disbursing benefits, [or] assuring employees that the plan or program exists." *Donovan*, 688 F.2d at 1373. In the insurance context, the Eleventh Circuit has commented that while "the purchase of insurance does not conclusively establish a plan, fund, or program, [ ] the purchase is evidence of the establishment of a plan, fund, or program." *Donovan*, 688 F.2d at 1373. Indeed, "the purchase of a group policy or multiple policies covering a class of employees offers substantial evidence that a plan, fund, or program has been established." *Id.*

Having considered the facts and circumstances surrounding the procurement of the disability insurance policies at issue here, the Court determines that Hemlock established an employee welfare benefit plan under ERISA.[10] The Court finds support for this conclusion in the reasoning of *Stern v. Provident Life & Accident Ins. Co.*, 295 F. Supp. 2d 1321 (M.D. Fla. 2003). *See also Jaffe v. Provident Life &*

---

[10] Because the Court finds that Hemlock "established" a plan, it need not consider whether Hemlock thereafter "maintained" it. *See* 29 U.S.C.A. § 1002(1) (defining employee welfare benefit plan in the disjunctive, requiring that it be "established *or* maintained by an employer").

*Accident Ins. Co.*, No. 996302, 2000 WL 349750 (S.D. Fla. March 21, 2000). Confronting facts substantially similar to those presented here, the court in **Stern** held that a plan was "established" under ERISA when a professional association of doctors paid the premiums on two insurance policies purchased voluntarily by the plaintiff—a doctor/employee of the association. The court noted that "the employer implemented the plan by providing . . . the financing source." **Id.** at 1326. That the association subsequently quit paying the premiums (making the doctor fully responsible for their payment) did nothing to change the fact that, in the court's view, a plan had been established. **Id.** ("Because the plans were established as ERISA policies, they remain subject to ERISA. This is so even though the plans were not 'maintained' as ERISA policies" once the plaintiff/insured began paying the premiums).

Here, after researching insurance plans offered by various companies, Hemlock made the decision to purchase disability insurance policies from Equitable. All doctors at the clinic were required to have coverage under Equitable-provided policies. Hemlock facilitated the purchase by paying the premiums on behalf of the doctors. Standing alone, none of these actions—(a) the decision to purchase coverage, (b) the requirement that each doctor be covered, or (c) the payment of the

19

premiums by Hemlock—conclusively establish the plan.  However, taken together, they provide substantial evidence that a plan was established under 29 U.S.C.A. § 1002(1)—*i.e.* evidence that Hemlock's decision to insure its doctors had become a reality.  Because the Court finds that the Equitable policies at issue are part of a benefit plan governed by ERISA, Dr. Stefansson's state-law claims are preempted by 29 U.S.C.A. § 1144(a).[11]  Accordingly, Defendants' motion for partial summary judgment is **GRANTED** and Dr. Stefansson's state-law claims are **DISMISSED.**

## C.  Motion to Remand Non-Justiciable Claim and to Determine the Proper Scope of Review

Defendants have moved the Court to remand Dr. Stefansson's claim for further administrative review.  They allege that Dr. Stefansson's actions have precluded DMS from rendering a benefits determination.  DMS insists that its review procedure was frustrated when Dr. Stefansson: (1) commenced this lawsuit before it could finish evaluating of his claim, and (2) transformed the medical basis of his claims after filing suit.  Only if Dr. Stefansson's claim is denied

---

[11] Under § 1144(a), the state-law claims asserted by Dr. Stefansson "relate to" the plan at issue, a prerequisite to ERISA preemption.  *See **Swerhun v. Guardian Life Ins. Co.**,* 979 F.2d 195, 197-98 (11th Cir. 1992) ("[T]here can be no dispute that the common law causes of action asserted by the plaintiffs—bad faith refusal to pay, fraud and breach of contract—'relate to' an employee benefit plan and therefore fall within ERISA's express preemption clause.'")(citations omitted).

administratively, argues DMS, will that decision be ripe for judicial review. Anticipating that any such denial would prompt a return to this Court, Defendants further move the Court to determine the appropriate ERISA standard of review.

Dr. Stefansson opposes any remand of his claim for further review or evaluation, arguing that DMS had sufficient time to evaluate his claim and render a final benefits decision prior to the commencement of this suit. By failing to do so in a timely manner, Dr. Stefansson argues, DMS effectively denied his claims, and the Court should treat that denial as final for administrative purposes.

First, the Court will consider whether a remand is appropriate. Second, the Court will determine the applicable ERISA standard of review.

### 1.    Remand of ERISA Claim for Further Administrative Review

Dr. Stefansson's claim for benefits should be remanded—or, more accurately, dismissed without prejudice[12]—to DMS for further evaluation only if he filed this suit without first exhausting his administrative remedies. *See **Curry v. Contract Fabricators Inc. Profit Sharing Plan***, 891 F.2d 842, 846 (11th Cir. 1990) ("[A] plaintiff must exhaust a plan's administrative remedies before bringing an ERISA suit."). With respect to the exhaustion requirement, the parties vigorously dispute whether

---

[12] *See **Nichols v. Prudential Ins. Co.***, 406 F.3d 98, 104 (2d Cir. 2005).

Dr. Stefansson's claim should be "deemed denied" in light of DMS's failure to render a benefits determination within the time limit imposed by ERISA's implementing regulations.  Specifically, they disagree about whether, given certain modifications to the regulatory scheme, a claim may still be deemed denied by operation of law, thus permitting a claimant to sue without first receiving a formal written denial from the claims administrator.  Resolution of this disagreement will have a significant effect on the future of this litigation.  If DMS's failure to render a benefits determination operates as a constructive denial of Dr. Stefansson's claim, then his ERISA suit is properly before the Court at this time.  If, on the other hand, the concept of a "deemed denial" is no longer recognized under ERISA, as DMS argues, then Dr. Stefansson prematurely interrupted the administrative-review process by filing his suit, and the Court should return his claim to DMS to allow him to exhaust his administrative remedies.

Every employee benefit plan must establish and maintain a reasonable claims procedure that provides for "adequate written denials of claims as well as an opportunity for 'full and fair review' of benefit denials."  *Curry*, 891 F.2d at 845; 29 U.S.C.A. § 1133 (West 1999); 29 C.F.R. § 2560.503-1(b) (2004).  To meet this reasonableness requirement under the ERISA regulations applicable to Dr.

Stefansson's claim, a plan providing disability benefits must, among other things, issue a benefits determination no later than 45 days after receiving a claim. 29 C.F.R. § 2560.503-1(f)(3) (2004). It is the consequence of a plan's noncompliance with this 45-day time limit over which the parties are at odds.

Under the former regulations, which governed claims made prior to January 1, 2002,[13] if a disability-benefits decision was not rendered and communicated to the claimant within the applicable time period,[14] the claim was "deemed denied" and the claimant was entitled to seek review of that denial in court.[15] This constructive denial therefore rendered the claimant's administrative remedies exhausted by operation of law.

In recent years, the Department of Labor has made some changes to ERISA's implementing regulations; changes which became effective January 20, 2001. It is these amended regulations that apply to Dr. Stefansson's claim. As a result of the

---

[13] *See* 29 C.F.R. § 2560.503-1(o)(2004).

[14] The former regulations required this decision to be made within 90 days after receipt of a claim. *See **Torres v. Pittson Co.**,* 346 F.3d 1324, 1332 n.10 (11th Cir. 2003).

[15] "[I]f notice of the denial of a claim is not furnished in accordance with . . . this section within a reasonable period of time [not more than 90 days after receiving the claim], the claim shall be *deemed denied* and the claimant is permitted to proceed to the review stage." 29 C.F.R. § 2560.503-1(e)(2) (amended by 29 C.F.R. § 2560.503-1(l)).

amendments, the phrase "deemed denied" was removed from the pertinent regulation, the new version of which now reads as follows:

> In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, *a claimant shall be deemed to have exhausted the administrative remedies* available under the plan *and shall be entitled to pursue any available remedies* [under ERISA] on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

29 C.F.R. § 2560.503-1(l) (2004) (emphasis added).

Defendants contend that this change in phraseology effectively makes the concept of constructive denials—a "deemed denied" claim—a thing of the past; no longer a sound principle of law under ERISA. This position does not appear to be supported by the understanding of the Eleventh Circuit, however. *See Torres*, 346 F.3d at 1332 n.10 (noting only that the regulatory amendments *modified* the "deemed denial" provision, not suggesting that the Department of Labor eliminated the concept of constructive denials). There is no hint in *Torres* that the current regulation has a different legal effect than its predecessor (except for the circumscribed time period within which a plan must act on a claimant's claim).

Though the regulation has been reworded, it is clear to the Court that a plan's failure to make a benefits determination within the prescribed 45-day period still

constitutes a constructive denial, just as it did with respect to pre-2002 claims.  In the Court's view, the current regulation expresses the "deemed denial" concept as plainly as the former regulation did before the amendments.  That the current regulation does not contain the phrase "deemed denied" is of little practical significance.  These are not magic words.  The current regulation carries forward the same concept, telling the claimant in simple and straightforward terms what his next course of action is if the plan administrator fails to act in accordance with the applicable procedures.

If a plan administrator does not follow the claims procedures as set forth in the regulation (*i.e.* does not make a determination within 45 days or within any permissible extensions), the claimant's administrative remedies will be "deemed" exhausted, leaving him free to pursue "any available remedies" (*i.e.* free to seek review of the denial in court).  *See* 29 C.F.R. § 2560.503-1(l).  Simply put, deeming a claimant's administrative remedies to be exhausted is tantamount to deeming his claim denied.

Dr. Stefansson's claim for benefits was received by DMS on July 11, 2003. (Defs.' Mot. to Remand, Ex. 11, tab 80).  It is undisputed that a benefits determination was not made within 45 days after the claim was received.  During

the 45-day period, DMS requested various documents from Dr. Stefansson, which he provided by mid-September.  Even assuming DMS's request for information constituted an allowable extension under the regulation (which permits up to two 30-day extensions), any such extension has long since passed.  DMS has yet to render a benefits determination, over two years after receiving Dr. Stefansson's claim.  Because DMS has failed to comply with the claims procedures prescribed by 29 C.F.R. § 2560.503-1(f)(3), the Court finds that Dr. Stefansson's claim was effectively denied and that he properly resorted to other "available remedies" by seeking judicial review through this lawsuit.  Accordingly, the Court finds that returning his claim to DMS for further consideration is not warranted.

### 2.     The Appropriate Standard of Review

"ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries."  *Williams v. Bellsouth Telecommunications, Inc.*, 373 F.3d 1132, 1134 (11th Cir. 2004) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)).  Three distinct standards have been judicially developed, however, and each requires the reviewing court to indulge in a different level of deference with respect to determinations made by the plan.  The three standards are: "(1) *de novo* where the plan does not grant the administrator discretion [*i.e.*, does not exercise discretion in

deciding claims;] (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] . . . [he has] . . . a conflict of interest."  *Id.* (alterations in original).

Courts ordinarily look to the language of the pertinent plan documents—here, the six policies issued to Dr. Stefansson—to determine whether discretion has been granted to the claims administrator.  *See* **HCA Health Serv. of Georgia, Inc. v. Employers Health Ins. Co.**, 240 F.3d 982, 993 (11th Cir. 2001).  Of the six policies, Defendants argue that two grant sufficient discretion to invoke application of the arbitrary-and-capricious standard of review.[16]  These two policies, issued in 1988 and 1989, define "proof of loss" as follows:

> If the policy provides for periodic payment for a continuing loss, written proof of loss *satisfactory to us* must be given within 90 days of the end of each monthly period for which we are liable.  For any other loss, such proof must be given within 90 days of that loss. (emphasis added).

*See* Policy No. 88 713 664 (June 1, 1988); Policy No. 89 712 722 (June 1, 1989), Exs. 6-7

---

[16] The parties agree that a *de novo* standard of review is appropriate under the remaining four policies, issued in 1983 and 1984, because they grant the claims administrator no discretion in making benefit determinations.  *See* Policy No. 83 707 839 (June 1, 1983); Policy No. 83 710 895 (August 1, 1983); Policy No. 84 707 682 (July 1, 1984); Policy No. 84 711 174 (September 1, 1984), Exs. 2-5 to Defs.' Mot. to Remand, tab 80.

to Defs.' Mot. to Remand, tab 80. To support their argument, Defendants cite several district-court opinions from this Circuit which have held that the "satisfactory to us" language triggers deferential review. *See Serauskus v. Sun Life Assurance Co.*, 205 F. Supp. 2d 1369, 1373 (N.D. Ga. 2001); *Sorrells v. Sun Life Assurance Co.*, 85 F. Supp. 2d 1221, 1230 (S.D. Ala. 2000); *Leggett v. Provident Life and Accident Ins. Co.*, No. 6:02-CV-1032ORL22KRS, 2004 WL 291223, at *9 (M.D. Fla. Feb. 9, 2004). Defendants argue that deferential review is proper because language requiring proof of loss satisfactory to the administrator "permits a subjective determination concerning the quality of the proof submitted by the claimant." Defs.' Mot. to Remand, tab 80, at 13. The Eleventh Circuit has not addressed whether the phrase "proof of loss satisfactory to us," standing alone, may be construed as granting discretion sufficient to invoke arbitrary-and-capricious review.

The circuit courts of appeal that have addressed the issue have reached differing conclusions about whether this type of language vests in the plan administrator sufficient discretion to justify applying the deferential standard. At least one circuit holds that it does. *See, e.g., Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555-58 (6th Cir. 1998) (en banc). Yet other circuits hold that it does not. *See, e.g., Fitts v. Federal Nat'l Mortgage Ass'n*, 236 F.3d 1 (D.C. Cir. 2001); *Herzberger v.*

*Standard Ins. Co.*, 205 F.3d 327 (7th Cir. 2000); *Kinstler v. First Reliance Standard*

*Life Ins. Co.*, 181 F.3d 243 (2d Cir. 1999); *Kearney v. Standard Ins. Co.*, 175 F.3d 1084

(9th Cir. 1999) (en banc); *Brown v. Seitz Foods, Inc. Disability Benefit Plan*, 140 F.3d

1198 (8th Cir. 1998).

Interesting though it may be, the Court need not choose sides in this semantic

debate. Even assuming that the 1988 and 1989 policies vest DMS with sufficient

discretion to trigger review under the arbitrary-and-capricious standard, the Court

concludes that, because DMS failed to render a benefits determination in accordance

with the regulatory requirements, application of the *de novo* standard of review is

appropriate.

Whether a plan's failure to make a timely benefits determination alters the

otherwise-applicable standard of review under ERISA is also a question currently

dividing the circuit courts of appeal.  The Eleventh Circuit has not weighed in on the

issue, but has noted the split of authority.  *See Torres v. Pittson Co.*, 346 F.3d 1324,

1332-33 (11th Cir. 2003).  Several circuit courts have noted that, when a claim has

been denied by operation of law for failure to abide by the relevant regulatory

provisions, such a denial is not entitled to deferential review on the grounds that the

administrator has not exercised any discretion.  *See Gilbertson v. Allied Signal, Inc.*,

328 F.3d 625, 631 (10th Cir. 2003); *Jebian v. Hewlett Packard Co.*, 349 F.3d 1098, 1103

(9th Cir. 2003); *Kinstler v. Standard Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999).[17]

According to the Tenth Circuit in *Gilbertson*—a decision which this Court

finds persuasive and well reasoned—applying a deferential standard of review to

a claim deemed denied by operation of law would be inconsistent with Supreme

Court precedent establishing *de novo* as the default standard of review under ERISA.

328 F.3d at 631 (citing *Firestone*, 489 U.S. at 111).  As Judge McConnell aptly noted:

> [T]o be entitled to deferential review [under *Firestone*], not only must
> the administrator be given discretion by the plan, but the
> administrator's decision in a given case must be a valid exercise of that
> discretion.  It follows that where the plan and applicable regulations
> place temporal limits on the administrator's discretion and the
> administrator fails to render a final decision within those limits, the
> administrator's "deemed denied" decision is by operation of law rather
> than the exercise of discretion, and thus falls outside of the *Firestone*
> exception [requiring deferential review when discretion is
> exercised]. . . . Deference to the administrator's expertise is inapplicable
> where the administrator has failed to apply his expertise to a particular
> decision.

*Id.* at 631-32.

---

[17] The Fifth and Sixth Circuits have taken the opposite approach, holding that a
"deemed denial" does not alter the standard of review otherwise appropriate under the plan
documents.  *See Southern Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 101 (5th Cir. 1993);
*Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988).  The Court has considered these cases,
but finds them unpersuasive.

The Court adopts the reasoning of **Gilbertson**, and holds that the *de novo* standard of review is appropriate in this case.[18]  Defendants argue that the *de novo* standard is inappropriate under **Gilbertson** because DMS engaged in an ongoing, meaningful exchange of information with Dr. Stefansson and at all times kept him reasonably well informed about the status of his claim.  It is true that DMS claims representatives communicated on several occasions with Dr. Stefansson.  But, so far as the Court is aware, DMS never informed Dr. Stefansson when he might expect to receive a decision; nor did DMS indicate how many separate reviews his claim might potentially undergo before a reasoned determination could be made regarding his eligibility or ineligibility for benefits.  Dr. Stefansson had no realistic way of knowing when his claim might be acted on.  Thus, the Court cannot say that DMS engaged in the sort of meaningful exchange that might preclude *de novo* review.

---

[18] The Court's conclusion is bolstered by the Department of Labor's explanation regarding the inclusion of 29 C.F.R. § 2560.501-1(l): "The Department's intentions in including this provision in the proposal were to clarify that the procedural minimums of the regulation are essential to procedural fairness and that a decision made in the absence of the mandated procedural protections *should not be entitled to any judicial deference.*"  65 Fed. Reg. 70255, fn. 39 (November 21, 2000) (emphasis added).  Though the Department's explanation is not entitled to the same sort of deference due under **Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.**, 467 U.S. 837 (1984), it is nevertheless persuasive to the Court.  *See* **Christensen v. Harris County**, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant **Chevron**-style deference.").

## III.   CONCLUSION

The Court has given due consideration to the issues presented by the parties

and, after carefully evaluating the facts and the relevant law, concludes as follows:

1.   Defendants' Motion for a Second Independent Medical Evaluation is
     **DENIED.**

2.   Defendants' Motion for Partial Summary Judgment is **GRANTED;**
     accordingly, Dr. Stefansson's state-law claims are preempted and thus
     **DISMISSED.**

3.   Defendants' Motion to Remand for Administrative Review is **DENIED;**
     moreover, the Court will apply the *de novo* standard of review to the
     denial of Dr. Stefansson's claim for disability benefits.

SO ORDERED, this 19th day of September, 2005.

**/s/ Duross Fitzpatrick**
DUROSS FITZPATRICK, JUDGE
UNITED STATES DISTRICT COURT

DF/sew